80 A.3d 298

**Hector BUTLER, Jr.**

v.

**S & S PARTNERSHIP, et. al.**

**No. 1, Sept. Term, 2013.**

Court of Appeals of Maryland.

Nov. 26, 2013.

636

638

Brian S. Brown and Saul E. Kerpelman (Saul E. Kerpelman & Associates, P.A., Baltimore, MD), on brief, for petitioner.

Frank F. Daily (Lisa M. Morgan, Sean P. Edwards, Law Offices of Frank F. Daily, P.A., Hunt Valley, MD), on brief; Argued by William C. Parler, Jr. (Kelly A. Grafton, Parler & Wobber, L.L.P., Towson, MD), on brief; Thomas J. Whiteford (Christopher C. Jeffries, David M. Stevens, Whiteford, Taylor & Preston, L.L.P., Baltimore, MD), on brief, for respondents.

Lisa J. Smith, Esq., Law Offices of David F. Albright, Jr., P.A., Baltimore, MD, for amicus curiae for Law Offices of David F. Albright, on behalf of clients.

Argued before BARBERA, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, McDONALD, and JOHN F. McAULIFFE (Retired, Specially Assigned), JJ.

GREENE, J.

This is a lead paint case involving two properties and multiple defendants, including both current and previous property owners and managers. The parties present issues regarding the interpretation of a Lead Paint Scheduling Order [1] ("scheduling order") filed in the Circuit Court for Baltimore City, the court's role in imposing sanctions for discovery violations, and the proof required to establish a prima facie case for violation of the Baltimore City Housing Code under Maryland's Consumer Protection Act ("CPA"), Maryland Code (1975, 2005 Repl.Vol.), § 13–301 of the Commercial Law Article.

## PROCEDURAL HISTORY

Petitioner Hector Butler, Jr., filed the instant Complaint on October 9, 2007, alleging negligence and violations of the CPA, for injuries resulting from exposure to lead-based paint during his residence at two properties in Baltimore City, 2238 Linden Avenue and 2308 Bryant Avenue, while Petitioner was an infant. The defendants are: S & S General Partnership ("S & S G.P."), Lee Shpritz ("Shpritz"), Barbara Benjamin ("Benjamin"),[2] S & S Partnership ("S & S"), Stanley and Rhoda Rochkind (the "Rochkinds"), N.B.S., Inc. ("N.B.S."),[3] Dear Management & Construction Co., Inc. ("Dear Management"), and Charles Runkles ("Runkles"). The Court of Special Appeals set forth the facts as to Petitioner's residence at the

---

1. A standard "Lead Paint Scheduling Order" comparable to the one used in this case is filed in all lead paint cases pending in the Circuit Court for Baltimore City.

2. Benjamin is not a party to this appeal as she was dismissed during the pendency of the appeal in the intermediate appellate court.

3. The Court of Special Appeals addressed issues relating to whether N.B.S. was considered an "owner," and, holding that N.B.S. does not fall under the housing code definition of "owner," affirmed the trial court's dismissal of N.B.S. That issue is not before this Court. Nevertheless, N.B.S. filed Briefs with this Court.

subject properties and the Respondents' respective interests in those properties as follows:

[Petitioner] was born on October 11, 1986. From approximately August 7, 1987 through May of 1988, appellant resided with [his mother Yvonne] Crosby in a third-floor apartment at [2238] Linden Avenue. During the first twelve days of Crosby and [Petitioner]'s tenancy, S & S G.P. owned the Linden Avenue property. Shpritz was a general partner in S & S G.P. On or about September 18, 1987, S & S G.P. sold the Linden Avenue property to Benjamin.

From approximately May of 1988 to August of 1991, [Petitioner] lived with Crosby in a second-floor apartment at [2308] Bryant Avenue. S & S owned the Bryant Avenue property from 1978 through 2008. The Rochkinds were partners in S & S. N.B.S., an entity related to S & S, did not own the Bryant Avenue property but, at some point, obtained a two million dollar loan secured by an indemnity deed of trust on the property.

*Butler v. S & S P'ship*, 207 Md.App. 60, 65, 51 A.3d 708, 710–11 (2012). On April 21, 2009, the Circuit Court issued its final scheduling order, applicable at the time of the motions at issue on this appeal. The Order provided in relevant part:

2. (a) All discovery including full resolution of all discovery disputes shall be completed no later than 09/09/09. Expert designations shall include all information specified in Rule 2–402(f)(1)(A) and (B).[4]

. . . .

(c) Defendants who still own a subject property shall allow the Plaintiffs to perform a non-destructive lead test upon the premises within 60 days of a written request provided that the request in [sic] made no later than four months prior to the discovery deadline in paragraph 2(a). The

---

**4.** This Rule was recodified in 2008, such that the "Trial Preparation–Experts" section is now designated as Md. Rule 2–402(g)(1)(A) and (B) instead of 2–402(f)(1)(A) and (B). For clarity, hereinafter we shall refer to this section as Md. Rule 2–402(g)(1)(A) and (B).

defendants shall be permitted to attend the lead test accompanied by a consultant(s) or expert(s).

After the close of discovery, Respondents filed a plethora of dispositive and evidentiary motions.[5] The trial court ultimately granted all of Respondents' motions, and Petitioner appealed to the Court of Special Appeals, which affirmed the Circuit Court's judgment. *Butler*, 207 Md.App. at 64–65, 51 A.3d at 710. Thereafter, Petitioner filed a petition for certiorari to this Court, which we granted on December 14, 2012. *Butler v. S & S P'ship*, 429 Md. 528, 56 A.3d 1241 (2012).

The issues before this Court relate to the exclusion of a lead test report prepared by Arc Environmental, Inc. (the "Arc Report"), the exclusion of testimony by Petitioner's medical expert, Dr. Klein ("Dr. Klein's Affidavit"), and the grant of summary judgment as to Petitioner's CPA cause of action. For clarity, we shall separate and address the facts as they relate to each issue below. We have also rephrased the underlying questions posed by the parties as follows: [6]

---

**5.** In its opinion, the Court of Special Appeals included a detailed chart depicting the disposition of each motion. *See Butler*, 207 Md.App. at 70–73, 51 A.3d at 713–15. We will discuss only the motions relevant to the issues before us.

**6.** The petition for certiorari raised the following questions: (1) In a lead paint case, where the plain language of the scheduling order provided that "Defendants who still own a subject property" shall be permitted to attend the lead test of that property, did CSA err in ruling that the Plaintiff was required to have notified the Defendants and to have permitted attendance at a lead test conducted at a property which was not still owned by a defendant? (2) Did the motions court err in imposing discovery sanctions on Plaintiff when no discovery motion was ever made by the Defendant, no objection was ever made regarding the discovery violations, and the court itself raised the discovery issues for the first time *sua sponte* in open court at a hearing on an unrelated motion with no advance notice to the Plaintiff that a sanctions motion was being considered by the court? (3) In a lead paint case located in Baltimore City, where the cause of action is based on MD's Consumer Protection Act, must a Plaintiff prove the existence of chipping, peeling and/or flaking paint at the inception of a lease, or is proof of any violation of the Baltimore City Housing Code which is present at lease inception and ultimately proximately causes an injury sufficient for a *prima facie* case for violation of the misrepresentation provisions of the CPA? (4) Did the trial court correctly grant summary judgment for

1. In this lead paint case, did the scheduling order require that these Defendants, who were not owners of the properties at the time Plaintiff conducted the lead tests at the properties, be given notice and an opportunity to attend the testing?

2. Did the trial court err in imposing discovery sanctions on Plaintiff when no discovery motion was made by Defendant, no objection was ever made regarding the discovery violations, and the court itself raised the discovery issues *sua sponte?*

3. In a lead paint case located in Baltimore City, where the cause of action is based on Maryland's Consumer Protection Act, must Plaintiff prove the existence of chipping, peeling and/or flaking paint at the inception of a lease to establish a prima facie case for a violation of the CPA?

We shall hold that the Court of Special Appeals erred in holding that the trial judge did not abuse her discretion in excluding the Arc Report and Dr. Klein's Affidavit, but was correct in affirming the Circuit Court's grant of summary judgment as to Petitioner's cause of action under the CPA.

## DISCUSSION

### I. Arc Report

#### A. Facts

Arc Environmental, Inc. ("Arc") is an environmental testing firm, apparently employed frequently by lead paint plaintiffs' attorneys in Baltimore City. On August 24, 2009, 16 days prior to the close of discovery, Arc conducted lead testing of the exterior of both 2238 Linden Avenue and 2308 Bryant Avenue. On the date of testing, 2238 Linden Avenue was owned by then-Defendant Benjamin. Also on the date of testing, 2308 Bryant Avenue was owned by S & S Business Trust, which was at no time a defendant in this case, and was managed by

Defendant because it was "unimpressed" with Plaintiff's evidence or did it thereby make an impermissible credibility determination?

Respondent Runkles. Prior to and at the time of testing, Petitioner provided no notice of the testing to any party and no defendant was present during the test.

On October 8, 2009, Respondent Runkles, joined by Respondents Rochkinds, S & S, and N.B.S., filed a Motion to Strike the Arc Report relating to 2308 Bryant Avenue, asserting that Petitioner "did not submit any written request to the owner or the manager of the property prior to having Arc Environmental conduct the lead paint survey," and had "failed in all respects to comply with the requirements of the [s]cheduling [o]rder. Because Petitioner had neither provided notice nor afforded any of the other parties the opportunity to attend the test, Respondents argued, Petitioner did not comply with section 2(c) of the scheduling order and the Arc Report must be excluded. Petitioner responded that he had not violated the scheduling order because section 2(c) only applies to "the rules for filing Motions to Enter Upon Land to defendants who still hold title to a subject property," and in any event, Petitioner had filed a Request for Entry Upon Land along with the Complaint.[7]

Benjamin also objected to the Arc Report as it related to 2238 Linden Avenue. She asserted in her Motion for Summary Judgment that, as owner of the property, she was entitled to notice and the opportunity to have her own expert attend the test on her behalf. Because the test was completed without such notice or opportunity to attend, in contravention of the scheduling order, she argued, the Arc Report resulting from that inspection could not be used as evidence against her in the case. In response, Petitioner contended that Benjamin had received a Request for Entry Upon Land with the Complaint, but that Benjamin had ignored the request. Furthermore, Petitioner argued, the lead test was completed within the discovery deadline. Benjamin responded that "at no time

---

7. The record shows that Petitioner filed with the Complaint in 2007 a Request for Entry Upon Land. In his Brief to this Court, however, Petitioner concedes that, as to the testing that occurred on August 24, 2009, "it is undisputed that ... Petitioner did not provide Respondents with notice that the testing was to occur."

whatsoever did [Petitioner's counsel] ever contact [Benjamin or Benjamin's counsel] to request property testing, arrange for property testing, or file a certificate of good faith effort to resolve a discovery dispute."

The trial judge heard arguments on these motions at the hearing on November 9, 2009. According to the judge, she excluded the Arc Report because it was disclosed "too late to do anybody any good, reflecting no good faith compliance with the scheduling order; no notice to the defendants to attend, participate, and afford their experts any realistic opportunity to address and respond to the Arc reports." The Court of Special Appeals affirmed, agreeing with the Circuit Court that the scheduling order was "clear enough" and holding that "[t]he court was within its discretion to fashion an appropriate remedy for [Petitioner's] violation." 207 Md.App. at 116, 51 A.3d at 740.

### B. Analysis

The first issue raises the question: who may attend a lead paint test? Specifically, we are called to decide whether the trial judge abused her discretion when she excluded the Arc Report based on her conclusion that Petitioner violated the scheduling order by failing to notify and allow all defendants the opportunity to attend the lead test of the subject properties. Our inquiry is twofold: first, whether the trial judge properly interpreted the scheduling order, and second, whether the trial judge abused her discretion by excluding the Arc Report. We shall hold that the scheduling order requires that notice and an opportunity to attend a lead test be given only to defendants who own the property at the time of testing, and that the exclusion of the Arc Report under the circumstances was an abuse of the trial judge's discretion.

### 1. Interpretation of the Scheduling Order

We review the trial court's interpretation of the scheduling order for legal correctness. *See Walter v. Gunter,* 367 Md. 386, 392, 788 A.2d 609, 612 (2002) ("[W]here the order involves an interpretation and application of Maryland statuto-

ry and case law, [the appellate] [c]ourt must determine wheth-
er the lower court's conclusions are legally correct . . . ."
(citation and quotation omitted)). The rules of construction
for Maryland's Rules of Procedure are well settled. "To
interpret rules of procedure, we use the same canons and
principles of construction used to interpret statutes." *State v.
Williams*, 392 Md. 194, 206, 896 A.2d 973, 980 (2006) (quoting
*State ex rel. Lennon v. Strazzella*, 331 Md. 270, 274, 627 A.2d
1055, 1057 (1993)). We look first to the plain language of the
rule. *See Williams*, 392 Md. at 207, 896 A.2d at 980 (quoting
*Strazzella*, 331 Md. at 274, 627 A.2d at 1057) ("When the
words are clear and unambiguous, ordinarily we need not go
any further.").

■ Section 2(c) of the scheduling order provides:

(c) Defendants who still own a subject property shall allow
the Plaintiffs to perform a non-destructive lead test upon
the premises within 60 days of a written request provided
that the request in [sic] made no later than four months
prior to the discovery deadline in paragraph 2(a). The
defendants shall be permitted to attend the lead test accom-
panied by a consultant(s) or expert(s).

This provision is divisible into two parts: Sentence 1 ("Defen-
dants who still own a subject property shall allow . . . .") and
Sentence 2 ("The defendants shall be permitted to at-
tend. . . ."). The trial court found that the scheduling order
was "clear enough" that Petitioner was required to give notice
to all defendants (now Respondents) and provide them with
the opportunity to attend the lead test. The Court of Special
Appeals agreed.

Petitioner argues that the scheduling order is "plain and
unambiguous" in that only defendants who own the subject
property are entitled to notice of the lead test of the property,
because the reference to "the defendants" in Sentence 2 refers
back to the "Defendants who still own the subject property."
Respondents, on the other hand, argue that notice and oppor-
tunity to attend must be given to all defendants, because
unlike Sentence 1, Sentence 2 does not qualify "defendants" as

only those who own the property, and therefore Sentence 2 must refer to all defendants generally. Moreover, Respondents contend that the plain language of the scheduling order does not indicate any intention to limit "defendants" to a single defendant with current ownership, and "if that had been the case, such an intention could easily have been conferred by using the term 'owner' instead of 'defendants.' "

Given that reasonable minds may differ as to the meaning of "the defendants" as used in Sentence 2, we disagree that the language is unambiguous, and therefore we look beyond the plain meaning to guide our review. *See Williams*, 392 Md. at 207, 896 A.2d at 980 ("Only when the language of the rule is ambiguous is it necessary that we look elsewhere to ascertain legislative intent. . . ."). As we are interpreting a trial court's scheduling order that has no recorded legislative history, we shall look to the context of section 2(c) within the discovery rules.

Section 2(c) relates to the inspection and testing of a property for the presence of lead paint. Md. Rule 2–422(a) governs such testing, and provides in pertinent part, that "[a]ny party may serve one or more requests to any other party . . . (2) to permit entry upon designated land or other property in the possession or control of the party upon whom the request is served for the purpose of inspection, measuring, surveying, photographing, testing, or sampling the property. . . ." Rule 2–422(c) further provides that the responding party may either permit or refuse the request to enter property. If there is a refusal, the requesting party may file with the court a motion to compel discovery pursuant to Md. Rule 2–432(b).

As this Court has noted, scheduling orders are "important tools to minimize discovery disputes and litigation delays." *Rodriguez v. Clarke*, 400 Md. 39, 59, 926 A.2d 736, 748 (2007). Section 2(c) of the scheduling order is clearly intended to streamline the discovery process outlined in Rule 2–422. Namely, by requiring the defendant property owner to allow the inspection upon receipt of a request, this provision "mini-

mize[s] discovery disputes and litigation delays" by preventing the defendant property owner from refusing the request for inspection and forcing the plaintiff to file a motion to compel, which the court would eventually grant.

In this same vein, Petitioner and Amicus contend that the scheduling order was "intended to govern the timing of inspections of properties still owned by defendants in a lead paint case." They argue that the provision only applies to "still owning" defendants because non-owner defendants "ha[ve] no power to arrange and allow inspections of properties they no longer own[ ]." Amicus further contend that the trial court's interpretation creates a new "unilateral, substantive legal right" of defendants to be present at inspections of properties they no longer own. On the other hand, Respondents S & S G.P. and Shpritz argue that "there is no logical basis for construing the [s]cheduling [o]rder as being intended to subject two defendants to different procedures with regard to the collection of evidence intended to be introduced to support identical claims against each defendant relating to the same property." Respondents S & S and N.B.S. also contend that "[a]llowing defendants to bring independent experts implies that the purpose is for the validation of evidence gathering, and therefore, it is applicable to all defendants, not just those who still own the property."

It is important to note that a scheduling order "impacts on the discovery process but does not directly expand or restrict the scope of it." *Dorsey v. Nold,* 362 Md. 241, 255, 765 A.2d 79, 87 (2001) (explaining that the purpose of scheduling orders is simply to facilitate discovery, and "move the case efficiently through the litigation process by setting specific dates or time limits for anticipated litigation events to occur"). As such, a scheduling order cannot give rights to defendants who do not own or control the properties in question. In addition, as to Respondent S & S's assertion that the purpose of the provision is for validation of evidence gathering, this argument lacks merit as there are adequate procedural safeguards for defendants to test the validity of evidence, most notably through cross-examination. Therefore, we hold that the

scheduling order, as written in the present case, applied to tests of properties still owned by a named defendant, and that only the defendant with ownership of the property has a right to attend the testing, consistent with the terms of the scheduling order.[8]

In the instant case, at the time of Petitioner's lead testing, 2238 Linden Avenue was owned by Defendant Benjamin. At the time of testing, 2308 Bryant Avenue was not owned by a named defendant. Because the scheduling order specifies "defendants who still own a subject property," we conclude that this provision only applied to the test of 2238 Linden Avenue, owned at the time of testing by Defendant Benjamin. The record reveals, however, that Benjamin is no longer a party to this case. It is undisputed that Respondents did not own either property when Petitioner's expert performed testing. Thus, Respondents have no basis to complain about any violation of the scheduling order as to Benjamin, who is no longer a party to the case. We next consider whether the trial judge abused her discretion when she excluded the Arc Report based upon a perceived scheduling order violation by Petitioner as it related to Benjamin and the remaining Respondents.

## 2. Exclusion of the Arc Report

"Just as there are sanctions for the violation of the discovery rules, sanctions are available for the violation of directives in scheduling orders, although they are not specified in any rule." *Dorsey*, 362 Md. at 256, 765 A.2d at 87 (citing *Manzano v. Southern Md. Hospital*, 347 Md. 17, 29, 698 A.2d 531, 536 (1997)). As to the type or severity of sanctions

---

**8.** This conclusion is consistent with real property law with respect to a property owner's "bundle of rights." *See Weems v. County Comm'rs of Calvert County*, 397 Md. 606, 619, 919 A.2d 77, 85 (2007) (noting that "amongst a property owner's 'bundle of rights' is the right to exclude others"). Moreover, as noted at oral argument in this case, based on the right to exclude, a defendant property owner could also, at his or her will, invite other defendants or anyone else onto the property during lead testing, which also would not be inconsistent with the terms of the scheduling order.

applicable to a scheduling order violation, this Court has pointed to

> the governing principle that the appropriate sanction for a discovery or scheduling order violation is largely discretionary with the trial court, and that the more draconian sanctions, of dismissing a claim or precluding the evidence necessary to support a claim, are normally reserved for persistent and deliberate violations that actually cause some prejudice, either to a party or to the court.

*Admiral Mortgage, Inc. v. Cooper*, 357 Md. 533, 545, 745 A.2d 1026, 1032 (2000). We therefore review the trial court's exclusion of the Arc Report under an abuse of discretion standard.

Although the abuse of discretion standard is highly deferential, a trial judge's discretion is not boundless. *See Nelson v. State*, 315 Md. 62, 70, 553 A.2d 667, 671 (1989) ("A trial judge is blessed with discretion in the exercise of many of his [or her] functions. The discretion is broad but it is not boundless."). This Court has explained that, in deciding whether to exclude evidence, a court should consider several factors, commonly referred to as the *Taliaferro* factors:

> Principal among the relevant factors which recur in the opinions are whether the disclosure violation was technical or substantial, the timing of the ultimate disclosure, the reason, if any, for the violation, the degree of prejudice to the parties respectively offering and opposing the evidence, whether any resulting prejudice might be cured by a postponement and, if so, the overall desirability of a continuance. Frequently these factors overlap. They do not lend themselves to a compartmental analysis.

*Taliaferro v. State*, 295 Md. 376, 390–91, 456 A.2d 29, 37 (1983). In addition, the Court of Special Appeals has explained that a court must consider the parties' good faith compliance with the scheduling order. *See Naughton v. Bankier*, 114 Md.App. 641, 653, 691 A.2d 712, 718 (1997) ("Indeed, while absolute compliance with scheduling orders is not always feasible from a practical standpoint, we think it

quite reasonable for Maryland courts to demand at least substantial compliance, or *at the barest minimum,* a good faith and earnest effort toward compliance.") (emphasis in original).

In the instant case, the trial court granted Respondents' Motion to Exclude the Arc Report after finding that Petitioner failed to comply with the scheduling order by not allowing defendants the opportunity to attend the lead test. The trial court explained that its ruling was based on the finding that the Report was disclosed "too late to do anybody any good, reflecting no good faith compliance with the scheduling order; no notice to the defendants to attend, participate, and afford their experts any realistic opportunity to address and respond to the Arc reports." The Court of Special Appeals affirmed, stating that "[t]he court was within its discretion to fashion an appropriate remedy for [Petitioner]'s violation[,] [and] [t]he remedy, i.e., excluding the reports, was not excessive...." 207 Md.App. at 116, 51 A.3d at 740.

Petitioner argues that the exclusion of the report was an abuse of discretion because Petitioner provided the Arc Report within the discovery deadline, and Respondents could have conducted their own tests had they so desired. Moreover, Petitioner contends, the trial court should have fashioned a remedy short of the "ultimate sanction" of dismissal, such as extending discovery so that Respondents could conduct a belated test. On the other hand, Respondents S & S and N.B.S. argue that exclusion of the Arc Report was appropriate for "Petitioner's strategic attempt to subvert the [s]cheduling [o]rder." Additionally, Respondents Rochkinds assert that the trial court did consider all of the *Taliaferro* factors before excluding the Arc Report when it found that the failure to comply with the scheduling order was a "substantial violation." Respondents S & S G.P. and Shpritz also note that the trial court made an "express finding that Petitioner had failed to act in good faith," and that Respondents were prejudiced by the late production of the report, which "frustrated any opportunity for the Respondents to obtain independent testing to confirm or rebut the findings."

Based on our holding that the trial court erred in its interpretation of the scheduling order, we conclude that the trial judge abused her discretion in excluding the Arc Report, where that decision was based essentially on the judge's finding that Petitioner failed to comply with the scheduling order. Moreover, considering the *Taliaferro* factors, the Arc Report was disclosed within the time limits for discovery and the failure to provide notice was a technical, rather than substantial, failure. Lastly, there is not a high degree of prejudice where the Arc Report was promptly disclosed, and, although perhaps not ideal where the case had already been pending for approximately two years, any potential prejudice could have been cured by a postponement or other less drastic sanction.

In addition, this Court is cognizant of the fact that a lead test constitutes a crucial piece of evidence in a lead paint case, capable of making or breaking the plaintiff's case. As the parties and the Court noted at oral argument, a lead paint test of the subject property is typically the "most fundamental piece of evidence in a lead paint case." In this case, the exclusion of the Arc Report played an important part in the trial court's decision to grant summary judgment. Similarly, in *Maddox v. Stone,* 174 Md.App. 489, 921 A.2d 912 (2007), the trial court excluded key expert testimony, where the expert's report was disclosed 34 days after the close of discovery in violation of the scheduling order, which led to a grant of summary judgment. The Court of Special Appeals stated that:

> [T]he imposition of a sanction that precludes a material witness from testifying, and, consequently, effectively dismisses a potentially meritorious claim without a trial, should be reserved for egregious violations of the court's scheduling order, and should be supported by evidence of willful or contemptuous or otherwise opprobrious behavior on the part of the party or counsel.

174 Md.App. at 507, 921 A.2d at 922 (holding that the trial court abused its discretion by excluding the expert testimony); *cf. Taliaferro,* 295 Md. at 391, 456 A.2d at 37–38 (upholding

the exclusion of a criminal defendant's alibi witness disclosed only at the close of the State's case at trial, noting that "[i]n the case at hand the rule violation was a gross one. There was no attempt at compliance .... [n]or did [defendant] present any excuse justifying the violation").

█ This Court has also addressed the issue of case-ending sanctions. In *Manzano*, we stated that dismissing a claim "is among the gravest of sanctions, and as such, is warranted only in cases of egregious misconduct...." 347 Md. at 29, 698 A.2d at 537 (citations omitted) (holding that the arbitration panel chair abused its discretion in dismissing the case for violation of a scheduling order where there was "no evidence of willful or contumacious behavior"); *see also Admiral Mortgage*, 357 Md. at 545, 745 A.2d at 1032 (affirming the trial court's denial of a motion to exclude, and stating that "the more draconian sanctions, of dismissing a claim or precluding the evidence necessary to support a claim, are normally reserved for persistent and deliberate violations that actually cause some prejudice, either to a party or to the court"); *Taliaferro*, 295 Md. at 395, 456 A.2d at 40 ("[T]he exclusion sanction should be one of last resort, to be invoked only in those cases where other less stringent sanctions are not applicable to effect the ends of justice." (citation and quotation omitted)). Accordingly, absent a showing of an egregious violation or "willful or contemptuous or otherwise opprobrious behavior," a court should not exclude fundamental and essential evidence that effectively dismisses a case for a violation of a scheduling order.

In this case, particularly where Petitioner disclosed the report before the discovery deadline, albeit shortly before, there is no "egregious violation" or "opprobrious behavior" that would warrant the "draconian sanction" of "precluding the evidence necessary to support [Petitioner's] claim." *Admiral Mortgage*, 357 Md. at 545, 745 A.2d at 1032. Notwithstanding the trial judge's finding of "no good faith compliance with the scheduling order," we hold that the trial court abused its discretion in excluding the Arc Report, a sanction that "effectively dismisse[d] a potentially meritorious claim," *Maddox*, 174 Md.App. at 507, 921 A.2d at 922, where the schedul-

ing order was ambiguous and the Report was disclosed before the close of discovery, causing no real prejudice to the Respondents or the court.

## II. Affidavit of Dr. Klein

### A. Facts

During discovery, Petitioner identified 18 experts whom he intended to call at trial, including Dr. Klein. In Petitioner's Answers to Interrogatories dated April 28, 2009, Petitioner set forth a generic description of each expert. As to Dr. Klein, Petitioner disclosed that Dr. Klein was an "expert in pediatric lead poisoning" and was expected to testify to the extent and permanency of Petitioner's injuries due to exposure to lead paint. Petitioner also provided that Dr. Klein would testify to the probable source of the lead exposure and that exposure to lead-based paint at all of the Respondents' subject premises, as stated in Petitioner's complaint, was a substantial factor in Petitioner's injuries. On July 2, 2009, Petitioner sent a letter to Respondents supplementing his Answers to Interrogatories, and, specifically, reiterating and expounding upon Dr. Klein's expected opinion as follows:

> Specifically, Dr. Klein will opine that the [Petitioner] was exposed to lead at all of the relevant addresses in this case, including the property owned and/or managed by [Respondents]. He is also expected to opine that the exposure took place during relevant time period(s) as alleged in the Complaint. He also is expected to opine that the [Petitioner's] lead poisoning and resulting learning disabilities, cognitive deficits, and other issues set forth in the psychologist's report, as well as other injuries (including but not limited to permanent brain damage, neurobehavioral deficits, math and reading disabilities, mental anguish, failure to achieve academically, emotional overlay and frustration) were caused by [Petitioner's] exposure to lead at the [Respondents'] properties. He is also expected to opine that [Petitioner] suffered a loss of IQ points as a result of exposure to lead. He is also expected to opine that all of [Petitioner's] injuries are permanent and irreversible. He is also expect-

ed to testify that [Petitioner's] exposure to lead at the subject addresses, as alleged in the complaint was a substantial contributing factor to [Petitioner's] injuries. He will also testify as to the [Petitioner's] educational and vocational abilities, or lack thereof.

. . . .

All of Dr. Klein's opinions will be made to a reasonable degree of medical probability.

[Petitioner] reserve[s] the right to supplement this answer should Dr. Klein develop any additional opinions during the course of this litigation.

If Dr. Klein produces a report, it will be provided. Dr. Klein will be made available for deposition at a mutually convenient time.

Pursuant to the scheduling order, the parties were required to "respond to all interrogatory requests concerning the findings and opinions of experts," as required under Md. Rule 2–402(g)(1)(A), by August 10, 2009. On October 9, 2009, Respondents S & S and N.B.S. filed a Motion to Exclude Testimony of Dr. Klein on the grounds that he did not conduct a physical examination of Petitioner, that there was no evidence of the existence of lead-based paint at the property, and that his opinion was based on capillector tests,[9] which Respondents argued are medically unreliable. Respondents argued that Dr. Klein had no reliable factual basis to assert that Petitioner had an elevated blood lead level while residing at 2308 Bryant Avenue, and that therefore, Dr. Klein lacked an adequate basis for his opinion and should be precluded from testifying. On October 27, 2009, Petitioner filed his Response to Respondents' Motion to Exclude Dr. Klein's Testimony, and attached Dr. Klein's affidavit to that Response. This was the first

---

**9.** Capillector tests, also referred to as capillary tests, are medical diagnostic tests of blood samples taken from a finger prick, as distinguished from venipuncture tests, which test blood samples taken directly from the vein. Respondents asserted in their motion that the medical community considers venipuncture tests to have a greater degree of reliability than capillector tests.

instance that Respondents received Dr. Klein's affidavit. The affidavit, in particular, elaborated on the causation of Petitioner's condition. Respondents thereafter filed replies to Petitioner's Response regarding Dr. Klein's affidavit, and Petitioner moved to strike the replies as untimely.

At the motions hearing on November 9, 2009, the trial judge excluded Dr. Klein's report based on Petitioner's failure to adhere to Md. Rule 2–402, because Dr. Klein's affidavit, which supplemented the "boilerplate" answers to interrogatories, was untimely. The trial judge reasoned that the interrogatory and letter responses were generic, and that the "belated opinions from experts ... have absolutely and decisively changed the legal landscape of this case." She further opined that she "agree[s] that it would have been the better practice for [Respondents] to file motions for sanctions or to exclude experts or to compel further expert disclosures prior to the scheduled close of discovery ... [b]ut the issue did not fully reveal itself until Dr. Klein disclosed the nature and manner [of his opinion]."

The Court of Special Appeals affirmed, concluding that the Circuit Court did not err in excluding the report, even though the court raised the issue *sua sponte,* because not only does the "court ha[ve] the right to enforce its own orders ... [and] may raise compliance issues *sua sponte* " but also where Petitioner moved to strike the Respondents' replies, "the court was entitled to raise the issue of [Petitioner's] compliance with the scheduling order because of [Respondents'] assertion that the reason for their replies was the late information supplied by [Petitioner]." 207 Md.App. at 120–21, 51 A.3d at 743.

## B. Analysis

The issue before this Court is whether the Court of Special Appeals erred in affirming the exclusion of Dr. Klein's affidavit when Respondents failed to file a motion to compel or a motion for discovery sanctions, and when the trial judge *sua sponte* raised the discovery violation for the first time at the November 9, 2009 motions hearing. We disagree with the

Court of Special Appeals and shall hold that the trial court's exclusion of Dr. Klein's affidavit was reversible error.

The trial judge based her decision to exclude Dr. Klein's report on the fact that Petitioner did not comply with Md. Rule 2–402(g)(1)(A). That rule states:

(A) Generally. A party by interrogatories may require any other party to identify each person, other than a party, whom the other party expects to call as an expert witness at trial; to state the subject matter on which the expert is expected to testify; to state the substance of the findings and the opinions to which the expert is expected to testify and a summary of the grounds for each opinion; and to produce any written report made by the expert concerning those findings and opinions. A party also may take the deposition of the expert.

Because the trial judge excluded Dr. Klein's affidavit on discovery grounds and because Respondents did not file any discovery motions, the relevant inquiry is the appropriate procedure to bring a discovery dispute before the trial court.

The intermediate appellate court has explained that "Maryland Rules 2–432 and 2–433 are interconnected; Rule 2–432 sets forth the available motions, and Rule 2–433 provides the applicable sanctions." *Hossainkhail v. Gebrehiwot*, 143 Md. App. 716, 730, 795 A.2d 816, 824 (2002). Under Md. Rule 2–432(a), "[a] discovering party may move for sanctions under Rule 2–433(a) without first obtaining an order compelling discovery" for certain complete failures to comply with discovery. Rule 2–432(b), on the other hand, calls for first moving for an order to compel discovery, if, among other situations, "(F) a party fails to supplement a response under [the general provisions governing discovery, which includes answers to interrogatories.]" The authors of the Maryland Rules Commentary explain:

When a party fails to provide discovery altogether, the party seeking discovery has two choices: to file a motion for immediate sanctions under section (a) of [Rule 2–432] or, in the alternative, to file a motion for a court order that compels the discovery under section (b) [of Rule 2–432].

The immediate sanctions available are those contained in section (a) of Rule 2–433.... With respect to any other failure of discovery, such as an incomplete or inadequate answer or a contested objection properly raised, the party may only file a motion to compel discovery under section (b). *An order compelling the discovery must be obtained prior to the impositions of certain sanctions....*

Paul V. Niemeyer and Linda M. Shuett, Maryland Rules Commentary 341 (3d ed.2003) (emphasis added) [hereinafter Md. Rules Commentary]; *see also Hossainkhail,* 143 Md.App. at 732, 795 A.2d at 825 ("[I]f there has been incomplete discovery, a party may seek an order compelling discovery under Rule 2–432(b). When a motion to compel discovery is granted and then violated, a court may award sanctions pursuant to Rule 2–433(b) 'upon motion of a party.' ").

The last sentence from the above excerpt is critical here. A trial court may not, *sua sponte,* exclude an expert's report based on discovery violations found under Md. Rule 2–432, without a party first moving for an order to compel or filing a motion for discovery sanctions.[10] When a discovery violation under that Rule has occurred, the issue must be before the trial judge before he or she may rule on it. "A court may award sanctions for failure of discovery, therefore, only when there is a discovering and moving party." *Hossainkhail,* 143 Md.App. at 730, 795 A.2d at 824; *see Fisher v. McCrary Crescent City, LLC,* 186 Md.App. 86, 123, 972 A.2d 954, 976 (2009) ("After receiving a motion for sanctions pro-

---

**10.** In *Broadwater v. Arch,* 267 Md. 329, 297 A.2d 671 (1972), this Court held that (1) summary judgment was an improper sanction for a failure to comply with the discovery rules; and (2) within the course of a summary judgment hearing, the trial judge has the discretion to "impos[e] sanctions *sua sponte* within the framework of the discovery rules." *Broadwater,* 267 Md. àt 335–36, 297 A.2d at 674. The second holding is consistent with this opinion, so long as the issue of violation of discovery is properly before the court. Indeed, Maryland case law supports the notion that a trial judge has the discretion to impose the discovery sanctions he or she deems appropriate, *Rodriguez v. Clarke,* 400 Md. 39, 56, 926 A.2d 736, 746 (2007), but a party must raise the discovery violation by motion to compel or motion for discovery sanctions before that may occur.

duced by either method . . . the court may enter such orders 'as are just[.]' "). Other jurisdictions have come to the same conclusion. *See Triffin v. Janssen,* 455 Pa.Super. 513, 688 A.2d 1212 (Pa.Super.Ct.1997) (holding that a *sua sponte* order by the trial judge was improper when a motion for exclusion under the appropriate discovery rule had not been filed); *Zep Mfg. Co. v. Anthony,* 752 S.W.2d 687 (Tex.App.1988) ("We have found no authority for the proposition that a trial court may impose sanctions sua sponte[ ]" when "[t]here were no motions before the court seeking any type of sanctions."); *Sheppard v. Johnson,* 255 Ga.App. 165, 165, 564 S.E.2d 729, 730 (Ga.Ct.App.2002) ("Before a complaint may be dismissed as a sanction for discovery abuse under [the Georgia Code], the trial court should engage in a two-step process: First, a motion to compel must be filed and granted; second, after the party seeking sanctions notifies the court and the obstinate party of the latter's failure to comply with the order granting the motion to compel and of the moving party's desire for the imposition of sanctions, the trial court may apply sanctions after giving the obstinate party an opportunity to be heard and determining that the obstinate party's failure to obey was wilful.").

Here, Respondents' Motion to Exclude Testimony of Dr. Klein alleged substantive and evidentiary violations, but did not contain any reference to a Rule 2–402 discovery violation. Respondents contended that Dr. Klein's opinions were unreliable and inadequate, not that his opinions did not comply with the discovery rules. Thus, there was no moving party in the present case and Petitioner's Rule 2–402 violation was not properly before the court. Accordingly, the trial court abused its discretion in excluding Dr. Klein's affidavit on the grounds that its admission violates the discovery rules.

Moreover, any discovery dispute apparently was waived by the parties, and the trial judge abused her discretion when she raised the issue for the first time at the November 9, 2009 motions hearing. We have held that "[a] party who answers a discovery request timely and does not receive any indication from the other party that the answers are inadequate or

otherwise deficient should be able to rely, for discovery purposes, on the absence of a challenge as an indication that those answers are in compliance, and, thus not later subject to challenge as inadequate and deficient when offered at trial." *Food Lion, Inc. v. McNeill*, 393 Md. 715, 736, 904 A.2d 464, 477 (2006). Because Respondents never filed a Motion to Compel or a Motion for Sanctions, Petitioners "should be able to rely, for discovery purposes, on the absence of a challenge as an indication that those answers are in compliance[.]" *Id.*

 It is important to the analysis in this case and to the bar to reconcile the difference between a discovery rule violation under Md. Rule 2–432 and a scheduling order violation, which is relevant to both Sections I and II of this discussion. While discovery rule and scheduling order violations are inherently linked, the method to properly bring such issues before the court are very different. As Respondents point out, a trial court has inherent authority to issue sanctions for a violation of a scheduling order by a party. *Station Maintenance Solutions, Inc. v. Two Farms, Inc.*, 209 Md.App. 464, 485, 60 A.3d 72, 84 (2013). This is true; a trial court has the discretion to control its docket and enforce its own orders. *Wynn v. State*, 388 Md. 423, 437, 879 A.2d 1097, 1105 (2005). Because a scheduling order is a court order, a trial judge has the authority to issue sanctions when the scheduling order is not followed.

 On the other hand, discovery is a process between the parties, a process under which disputes may be waived or raised by the parties without court intervention. *See Sindler v. Litman*, 166 Md.App. 90, 127, 887 A.2d 97, 118 (2005) ("Ordinarily, a discovering party must pursue available remedies to obtain discovery or the party will not be heard to complain. It is also true, however, that courts encourage parties to resolve discovery issues without court intervention."); *see also Hallman v. Gross*, 190 Md. 563, 574, 59 A.2d 304, 308–09 (1948) ("The various instruments of discovery now serve ... to narrow and clarify the basic issues between the parties...."); Md. Rule 2–431 ("A dispute pertaining to discovery need not be considered by the court unless the attor-

ney seeking action by the court has filed a certificate describing the good faith attempts to discuss with the opposing attorney the resolution of the dispute and certifying that they are unable to reach agreement on the disputed issues."); Md. Rules Commentary at 268, 269, 271 ("[D]iscovery material is not routinely filed [with the court]," and "[d]isputes concerning discovery should be worked out among counsel." Also, "the parties are encouraged to develop a discovery plan to comply with the court schedule [but] if they are unable to reach agreement on a plan, they may seek court assistance."). Thus, a trial judge does not have the inherent authority to order discovery sanctions under Md. Rule 2–433 without a party moving for such an action, either by a motion to compel or a motion for discovery sanctions. *See Hossainkhail*, 143 Md.App. at 730, 795 A.2d at 825.[11]

Not only was it an abuse of discretion to raise the potential discovery violation without a party moving to do so, but the sanction imposed is inconsistent with our case law with regards to sanctions for non-egregious activity.[12] This Court has explained that "the more draconian sanctions, of dismissing a claim or precluding the evidence necessary to support a claim, are normally reserved for persistent and deliberate violations that actually cause some prejudice, either to a party

---

**11.** This is the inherent difference between the trial judge's exclusion of the Arc Report and Dr. Klein's Affidavit. The Respondents alleged that the untimely admission of the Arc Report violated the scheduling order, therefore that issue was properly before the trial court. Dr. Klein's expert designation, on the other hand, was raised by the trial court as a potential discovery violation, which was waived when Respondents failed to file a motion to compel, and was therefore *not* properly before the trial court.

**12.** The authors of the Maryland Rules Commentary have pointed out that "[i]n cases involving the important interests of children, a court must exercise heightened scrutiny before finding a default or dismissing a case against a child's interests for failure to comply with discovery requests." Md. Rules Commentary at 345 (citing *Berrain v. Katzen*, 331 Md. 693, 711, 629 A.2d 707, 715 (1993) (holding that a trial court abused its discretion in dismissing the case when the plaintiff was a minor represented by a next friend because "the trial court has a special duty to protect the rights and interests of the minor ...")).

or to the court." *Admiral Mortgage,* 357 Md. at 545, 745 A.2d at 1032; *cf. Thomas v. State,* 397 Md. 557, 572, 919 A.2d 49, 58 (2007) ("Exclusion of evidence for a discovery violation is not a favored sanction and is one of the most drastic measures that can be imposed."). Here, the trial judge excluded the testimony of the expert who was opining as to the causation of Petitioner's injuries. This evidence is crucial to support Petitioner's causes of action, and ultimately resulted in the trial court granting Respondents' motions for summary judgment.

Additionally, in the interest of fairness, "[a]ll parties and any persons affected must be given notice of a motion to compel discovery, for a protective order, or for sanctions." Md. Rules Commentary at 344; *see Zep Mfg.,* 752 S.W.2d at 690 ("Without a motion before the trial court that asked for sanctions for discovery abuse, the relator had no notice that the hearing scheduled on other discovery motions would result in respondent's spontaneous striking of its pleadings. Notice is essential for the proper imposition of sanctions."). Because Petitioner was not afforded the prerequisite notice that his alleged discovery failure would be at issue at the November 9, 2009 motions hearing, he was unduly prejudiced, and the exclusion of Dr. Klein's report was unreasonable under the circumstances. Therefore, the Court of Special Appeals erred in affirming the trial court's exclusion of Dr. Klein's affidavit on discovery violation grounds.[13]

### III. Consumer Protection Act

### A. Facts

In his Complaint, Petitioner alleged that at the time each Respondent leased their respective properties to Yvonne Cros-

---

**13.** We note that the trial judge granted summary judgment based in large part on the exclusion of the Arc Report and Dr. Klein's affidavit, two key pieces of evidence. "In appeals from grants of summary judgment, Maryland appellate courts, as a general rule, will consider only the grounds upon which the lower court relied in granting summary judgment." *PaineWebber Inc. v. East,* 363 Md. 408, 422, 768 A.2d 1029, 1036 (2001). Accordingly, we do not consider whether the trial court's grant of summary judgment could have been sustained on other grounds.

by, Respondents "knew that the dwelling was not of such quality and contained flaking, loose or peeling paint or plaster or lead[-]based paint accessible to children," in violation of the Baltimore City Housing Code. Petitioner alleged that Respondents "impliedly represented that the dwelling was in compliance with the Housing Code ... and thus was fit for human habitation and contained no flaking, loose or peeling paint or plaster, or lead based paint accessible to children," that such implicit representation is an unfair or deceptive trade practice and, therefore, Respondents violated the CPA.

Yvonne Crosby was deposed on August 26, 2009. She testified as to the condition of both properties and to Petitioner's activities in and around both properties. With regard to 2308 Bryant Avenue, Crosby testified that she and Petitioner occupied the second and third floors of the property. According to Crosby, Petitioner played either inside the house or at a park across the street, but he never played outside in the front or the rear of the property. She stated that the property had been freshly painted when she moved in, but the paint subsequently began to chip around the baseboards, the doors, and the windowsills.

With regard to 2238 Linden Avenue, Crosby testified that she resided on the third floor of the building. As before, she stated that Petitioner also did not play outside at this property. She testified further that when she first moved into the property, it was clean and painted. Crosby did not recall any deteriorated paint in the apartment at the beginning of her tenancy. Over time, however, Crosby stated that she noticed chipping paint around the windowsills. Finally, she testified that she did not remember observing Petitioner put paint chips into his mouth during either of these tenancies, but that he was tested for lead two or three times.[14]

---

14. Petitioner's medical records revealed that capillector tests were conducted on June 9, 1988, September 7, 1988, and April 4, 1990. The September 7, 1988 and April 4, 1990 tests indicated elevated blood lead levels. In addition, according to Department of Health & Mental Hygiene ("DHMH") records, a single venipuncture test, taken on November 10, 1987, indicated an elevated blood lead level.

Based in part on this testimony, Respondents N.B.S. and S & S, joined by the Rochkinds, filed a Motion for Partial Summary Judgment, asserting that Crosby's testimony that there was no chipping, peeling, or flaking paint at 2308 Bryant Avenue at the inception of the lease negated any alleged violation of the CPA. In addition, Respondents argued that there existed no negligent or intentional misrepresentation and that Petitioner's claims were based on a non-existent agreement. Respondents thus claimed that there existed no dispute of material fact with regard to Petitioner's cause of action under the CPA.[15]

During argument on the summary judgment motion at the November 9, 2009 hearing, Petitioner argued that there was a dispute of fact based on Petitioner's Answer to Interrogatory indicating that Respondents improperly repaired surfaces before painting over old paint. The relevant question and answer read as follows:

**INTERROGATORY NO. 17:** State all facts and identify all documents, including but not limited to all dates when you allege these events occurred and all witnesses to these alleged events, upon which you base your allegations [of a CPA violation] against [Respondents].

**ANSWER:** [Respondents] violated the Maryland Consumer Protection Act by offering a home for rent that was not in compliance with the Baltimore City Code. **[Respondents] negligently repaired and painted the premises prior to the inception of the lease, painting over old paint without properly preparing the surfaces as required by the Housing Code.** [Respondents] allowed chipping, peeling and flaking lead[-]based paint to remain on the premises in violation of Sections 702, 703 and 706 or [sic] the Baltimore City Housing Code. At the inception of the tenancy, the

---

15. Respondents Shpritz and S & S G.P., the manager and owner, respectively, of 2238 Linden Avenue at the time Crosby entered the lease for that property, also filed a Motion for Summary Judgment, but did not specifically address whether Petitioner had established the elements required to prove a cause of action under the CPA. Their Motion, nevertheless, was granted at the November 9, 2009 hearing.

house had chipping, flaking and peeling paint throughout, especially around the windows, on sills, baseboards, doors, on bathroom walls and bedroom walls.

(Emphasis added). Respondents countered with Crosby's testimony that 2308 Bryant Avenue had been freshly painted when she moved into the property, and chipping paint was not observed until well after her tenancy began. The trial court, concluding that "there is no way that a reasonable person could conclude or infer that there was flaking, chipping, peeling paint at the inception of the lease at [2308] Bryant [Avenue] at the relevant time," and stating that she was "unimpressed with the interrogatory answer by Hector Butler intended to be to the contrary," granted the Motion for Partial Summary Judgment and dismissed Petitioner's alleged CPA violation.

The Court of Special Appeals affirmed, holding that "[t]he undisputed facts in the record indicate that the walls were painted and repaired and there was no peeling or flaking paint at the time [Petitioner] entered into the lease and moved into the property . . . . [therefore,] [t]here was simply no admissible evidence to support a CPA claim against [Respondents]." 207 Md.App. at 119, 51 A.3d at 742. The intermediate appellate court also "disagree[d] that the [trial] court made a credibility determination" when the trial judge stated that she was "unimpressed" by Petitioner's answers to interrogatories. *Id.*

### B. Analysis

The question of whether a trial court's grant of summary judgment was proper is a question of law. *D'Aoust v. Diamond,* 424 Md. 549, 574, 36 A.3d 941, 955 (2012). Pursuant to Md. Rule 2–501(f), summary judgment is proper where there is no genuine dispute as to any material fact and the party in whose favor judgment is entered is entitled to judgment as a matter of law. *120 W. Fayette St., LLLP v. Mayor of Baltimore,* 413 Md. 309, 329, 992 A.2d 459, 471 (2010). To establish a genuine issue of material fact, a "party opposing summary judgment must do more than simply show

there is some metaphysical doubt as to the material facts. In other words, the mere existence of a scintilla of evidence in support of the plaintiff's claim is insufficient to preclude the grant of summary judgment; there must be evidence upon which the jury could reasonably find for the plaintiff." *Beatty v. Trailmaster Products, Inc.*, 330 Md. 726, 738–39, 625 A.2d 1005, 1011 (1993) (citations and quotations omitted). Here, we conclude that there existed no genuine dispute of material fact and therefore, the trial court's grant of summary judgment was proper as a matter of law.

■ Our analysis as to whether the trial court's grant of summary judgment was proper as a matter of law begins with whether Petitioner was required to prove the existence of chipping, peeling, or flaking lead-based paint at the lease's inception to establish a CPA violation. Petitioner asks this Court to consider whether peeling, chipping, or flaking lead-based paint is the *only* means by which a person can establish a violation of the CPA.

■ We first look to the relationship between the CPA and the Baltimore City Code for clarity. "The purpose of the CPA is to protect consumers from unfair or deceptive trade practices that induces prospective tenants to enter into a lease." *Butler*, 207 Md.App. at 118, 51 A.3d at 741; *Richwind Joint Venture 4 v. Brunson*, 335 Md. 661, 682–83, 645 A.2d 1147, 1157 (1994), *overruled on other grounds by Brooks v. Lewin Realty III, Inc.*, 378 Md. 70, 835 A.2d 616 (2003). This Court has explained:

> As we have seen, a landlord leasing or agreeing to rent a dwelling intended for human habitation is deemed to covenant and warrant that it is fit for human habitation.... To prove a violation of the CPA premised on the breach of the implied warranty of habitability, it must be shown that, at the inception of the lease, the landlord made material misstatements or omissions, which either had the tendency to or, in fact, did, mislead the tenant. Thus, the landlord must have knowledge, constructive or actual, of the condition of the premises at the time of the lease. The implied warranty provisions establish a threshold for the lease of

premises and that threshold is based on the purpose of the Baltimore City Housing Code, to make dwellings safe, sanitary and fit for human habitation, for the benefit of the health and safety of the people.... Here, sections 702, 703 and 706 of the City Code prescribe the standard for the lease of premises for human habitability[.]

*Benik v. Hatcher*, 358 Md. 507, 530–32, 750 A.2d 10, 23–24 (2000) (citations omitted).

Baltimore City Code (1983 Repl.Vol.), Art. 13 §§ 702, 703, and 706 are the threshold warranties of lead-based paint CPA violations. Section 702 provides in pertinent part: "Every building and all parts thereof used or occupied as a dwelling shall ... be kept in good repair, in safe condition, and fit for human habitation." Sections 703 and 706 more specifically apply to lead-based paint, and state in pertinent part: "All walls, ceilings, woodwork, doors and windows shall be kept clean and free of any flaking, loose or peeling paint and paper.... All interior loose or peeling wall covering or paint shall be removed and the exposed surface shall be placed in a smooth and sanitary condition."

Petitioner is correct when he argues that a violation of the Baltimore City Housing Code could constitute a violation of the CPA. In order for a CPA violation to occur, the Housing Code violation must exist at the inception of the lease. This Court has made clear that if "[a]t the time the lease ... was entered into, there was no chipping or peeling paint on the premises ... [then] the landlord could not be said to have engaged in a deceptive trade practice under the CPA." *Scroggins v. Dahne*, 335 Md. 688, 696, 645 A.2d 1160, 1164 (1994). This Court explained this point in more detail that same day:

Although the premises leased in the instant case obviously contained lead-based paint, that alone would not have rendered them uninhabitable or in violation of the CPA. Renting a premises with intact, lead-based paint is not in itself a violation of the CPA. The plaintiff's CPA claims were based on the landlords' failure to disclose that there was peeling, chipping, or flaking lead-based paint which constituted an

unsafe condition. There was no evidence that at the time the lease was entered into there was any peeling or chipping paint. As we have indicated, mere silence about a condition that arises during the term of this lease, rather than prior to or at the time the lease is entered into, is not a violation of the CPA.

*Richwind,* 335 Md. at 686, 645 A.2d at 1159. Under established Maryland precedent, therefore, it is clear that there must be loose or peeling paint at the inception of a lease for the hazard to qualify as a basis for a CPA violation; the Baltimore City Code calls for removal of any peeling or loose paint, and this Court clarified that "intact, lead-based paint is not in itself a violation of the CPA." *Id.*

Next, we must determine whether Petitioner demonstrated the existence of "a genuine dispute as to a material fact by proffering facts which would be admissible in evidence" to survive summary judgment on his CPA claim. *Beatty,* 330 Md. at 737, 625 A.2d at 1011. As we have noted, the party opposing summary judgment must provide more than "general allegations which do not show facts in detail and with precision." *Rite Aid Corp. v. Hagley,* 374 Md. 665, 684, 824 A.2d 107, 118 (2003) (citation omitted). Moreover, "a party must provide the court with more than a different theory of how the events transpired[, and] conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment[.]" *Benway v. Md. Port Admin.,* 191 Md.App. 22, 46, 989 A.2d 1239, 1253 (2010) (citations and quotations omitted).

■ At the November 9, 2009 hearing on Respondents' Motion for Summary Judgment, Petitioner argued that there existed a genuine dispute of material fact based on his Answer to Interrogatories, in which he asserted that Respondents "negligently repaired and painted the premises prior to the inception of the lease, painting over old paint without properly preparing the surfaces as required by the Housing Code." [16] If

---

**16.** In essence, Petitioner attempts to establish a cause of action under the CPA by alleging negligence. The CPA, however, requires a showing

supported by a sufficient factual basis, we agree that an assertion that Respondents actively concealed or disguised loose or flaking paint at the inception of the lease could potentially raise a question of material fact. If that were the case, peeling or loose paint would still exist in the property, whether the paint is chipping at the surface or under a fresh coat of paint intended to conceal the housing code violation.

 We conclude, however, that Petitioner's Answer to Interrogatory is no more than "mere general allegations which do not show facts in detail and with precision [and therefore] are insufficient to prevent summary judgment." *Beatty*, 330 Md. at 738, 625 A.2d at 1011. As we have recognized, although "a court must resolve all inferences in favor of the party opposing summary judgment, 'those inferences . . . must be *reasonable* ones.' " *Beatty*, 330 Md. at 739, 625 A.2d at 1011 (citing *Clea v. City of Baltimore*, 312 Md. 662, 678, 541 A.2d 1303, 1311 (1988)) (emphasis in original). The assumptions made by Petitioner as written in the interrogatory response lack any basis of knowledge or factual predicate to support Petitioner's conclusions. Rather, it is a "conclusory state-ment[ ], conjecture, or speculation," which, without any sup-porting facts based on personal knowledge, is insufficient to demonstrate a genuine dispute of material fact and defeat summary judgment. *Benway*, 191 Md.App. at 46, 989 A.2d at 1253. *See also Lowman v. Consolidated Rail Corp.*, 68 Md. App. 64, 73–74, 509 A.2d 1239, 1244 (1986) (holding that plaintiffs did not establish a genuine dispute of material fact to prevent summary judgment where plaintiffs relied on "a bald assertion completely unsupported by facts" found in plaintiffs' responses to interrogatories and where plaintiffs "failed to support any of their allegations with facts based on personal knowledge"). In this case, Petitioner presented no admissible factual evidence for a trier of fact to reasonably infer that Respondents concealed or disguised peeling or flaking paint that existed at the inception of the lease. The undisputed

of misrepresentation, deceit, or falsities, all of which have sound bases in fraud.

facts are that Petitioner's mother testified that there was no evidence of chipping or peeling paint at the inception of either lease and that the Petitioner, who made the allegations of improperly prepared surfaces in his Answer to Interrogatories, was an infant at the time of the tenancy. Accordingly, there is no reasonable basis for a trier of fact to conclude that chipping or peeling paint existed at the inception of the lease. Therefore, we affirm the grant of summary judgment as a matter of law.[17]

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED IN PART AND AFFIRMED IN PART. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REMAND THE CASE TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE DIVIDED EQUALLY BY THE PARTIES.**

HARRELL, J., Concurs.

HARRELL, J., concurring.

I join the judgment in this case, for the reasons explained in Parts II and III of the majority opinion (Maj. op. at 653–70, 80 A.3d at 309–19). I do not subscribe, however, to much of the analysis or the holding of the Majority opinion in its Part I (Maj. op. at 643–55, 80 A.3d at 303–10). Although I agree that Section 2(c) of the Scheduling Order is, on its face, ambiguous

---

**17.** Petitioner also submits to this Court that the trial court erred when it made a credibility determination by stating that it was "unimpressed" by the evidence put forth under the CPA cause of action. While the use of the term "unimpressed" may have suggested an evaluation of the merits of the evidence, we do not believe that the trial court was making a credibility determination. Rather, as this Court concludes, the trial judge determined that Petitioner offered no evidence to establish that there was chipping or peeling paint at the inception of the lease, as required by Maryland law when establishing a lead-based paint cause of action under the CPA. The lack of any material evidence to establish Petitioner's claim is what is "unimpressive," and this Court affirms the trial court's judgment in granting summary judgment as to the cause of action under the CPA.

(Maj. op. at 646–47, 80 A.3d at 305–06) and that there has been offered to us naught but anecdotal recollections from select participants of the "lead paint Bar" of their perception of how and why the language of that Section came to be as it exists in the present case (Maj. op. at 647, 80 A.3d at 305–06), my view of the correct interpretation of "[t]he defendants [to be] permitted to attend the lead test accompanied by a consultant(s) or expert(s)" differs in a material way from the Majority.

Section 2(c) intended (quite clearly) to address more than the problem of assuring to plaintiffs the right to enter upon "a subject property . . . to perform a non-destructive lead test," although that appears to be the main thrust of the Section. Of course, it is the legal right of a present owner or owners of a subject property to control who enters upon his/her/its property that must be overcome to assure that a test may occur. Past owners are irrelevant to the question of securing contemporary entry upon the property. Even less relevant for this purpose are other defendants who never had an ownership or management interest in a subject property during the time the plaintiff(s) resided in the dwelling.

As regards construing which defendants are entitled to notice of when a lead test of a dwelling is to be made by a plaintiff, however, the interests of present defendants, who were past owners or managers of the affected rental property at times when the plaintiff(s) resided there, are implicated demonstrably. The application of the lead test results to them may be (and usually are) just as significant in determining their liability as the results would be to the present owner/manager defendants whose permission is given (implicitly) for the test to be conducted. For the Majority opinion to conclude, as it does (Majority op. at 645–46 and 648–49, 80 A.3d at 304–05 and 306–07), that only present owner/manager defendants of the property are entitled to notice and an opportunity to attend (with their consultant(s) or expert(s)) to observe how the test is conducted is wrong and prejudicial manifestly.[1]

---

1. I agree with the Majority opinion that a defendant who never owned or managed the subject property (during the plaintiffs' occupancy) is

The only rational way, in my view, to interpret Section 2(c) of the Scheduling Order is that it is an assurance to the present-owner/manager defendant of a property to be tested, and to any former-owner/manager defendant of the property, of notice and opportunity to attend the testing. Failure to give the notice to, or other frustration of the right to attend by, each of these categories of defendants is a rational and appropriate basis upon which to have excluded the Arc Report in this case.

At the time of the 24 August 2009 Arc testing of 2238 Linden Avenue and 2308 Bryant Avenue, the former property was owned by the defendant Benjamin [2] and the latter property by a non-defendant (S & S Business Trust) (Maj. op. at 643, 80 A.3d at 303). At the time of testing, the defendant Runkles managed the latter property. Runkles remains in the case as a Respondent in this Court. Moreover, as to the Linden Avenue property, it was alleged by Petitioners in their complaint that S & S General Partnership owned the property during part of Petitioners' relevant occupancy (Shpritz, another defendant and Respondent here, was the Partnership's general partner). As regards the Bryant Avenue property, S & S Partnership (composed of the Rochkinds, defendants and Respondents), owned the property at all times that Petitioners resided there. The remaining defendants/ Respondents, Runkles and Dear Management & Construction Co., Inc., managed allegedly the properties during relevant times. It is conceded that no notice or opportunity to attend Petitioners' lead testing of either property was afforded the respective defendant

_____

not entitled to notice or the opportunity to attend the testing. See footnote 3 *infra*.

**2.** As the Majority opinion notes, Benjamin ceased to be a party defendant sometime while the case was on appeal in the Court of Special Appeals (Maj. op. at 648–49, 80 A.3d at 306–07). Contrary to the Majority's attribution of significance to that fact, what is important for present purposes is that Benjamin was a defendant/present-owner at the time of testing (and entitled to notice and an opportunity to attend testing, under my view of Section 2(c)) and at the time the trial judge

owners or managers (whether former or as of the date of the tests) of the respective properties.[3] Under these circumstances, the trial judge was justified entirely to exclude the Arc Report as to both properties.

It is not a cure for the bald failure to give notice and an opportunity to attend testing that the affected defendants may cross-examine at trial presumably any witness offered by Petitioners in the course of trying to gain admission of the Arc Report or its contents. The handicap of not being able to verify with the defendants' (or their consultants' or experts') own eyes how and where the lead testing was conducted by Petitioners' Arc expert places them, to a large degree, at the mercy of whatever the witness chooses to say, whether true, false, or merely overly generous in its slant toward what may be in plaintiffs' best interests.

excluded the Arc Report and entered judgment in favor of all defendants.

3. I do not contend that the defendant owner(s)/manager(s) of 2238 Linden Avenue were entitled to notice and opportunity to attend the lead test administered to 2308 Bryant Avenue, or vice versa.